This multiple indictment and conviction arose in the Circuit Court of Montgomery County. Appellant, Robert Lee Woods, was charged in one indictment consisting of three counts: Burglary, armed robbery and kidnapping. The indictment further charged that as appellant had two prior felony convictions on separate charges and had received sentences of more than one year under each, he should receive an enhanced sentence as a habitual criminal under Mississippi Code Annotated section 99-19-81 (Supp.).
The trial resulted in the conviction of appellant under all three counts of the indictment. The jury failed to agree on punishment under the armed robbery and kidnapping charges. The trial judge then sentenced appellant to a term of fifteen years with the Department of Corrections under the burglary conviction, and two life sentences for the armed robbery and kidnapping convictions.
Appellant alleges a number of errors which, he contends, require a reversal of the cause. We shall hereafter discuss those alleged errors as presented. First, however, we should get the case in perspective as it was received by the jury.
The principal witness for the prosecution was one Carnell Ward, a fifty-nine year old male. He testified that on January 6, 1980, at about two o'clock P.M., he was not feeling well and was in bed at his home. The appellant, with whom Ward was acquainted, came to the door and demanded entrance. Ward told him that he could not enter, whereupon appellant kicked in the door which was locked and entered Ward's room. Appellant produced a silver-plated 38-caliber pistol and demanded Ward's money. The latter told appellant that all his money was in the pocket of his pants that were on a chair near the bed. Appellant went through the pockets of the pants and took the sum of $13.
According to Ward, appellant then demanded that Ward dress and go with him in Ward's car. Appellant dragged him into the car, cautioning him to say nothing and to play like nothing was happening during the course of the trip they were about to take. Appellant had secured the car keys from Ward's pocket. Ward testified that he was required to drive and that they first *Page 1321 
went to the home of a Mrs. Robertson. Ward described in detail the route taken and the places they passed on the way. At the Robertson house, appellant bought some corn whiskey and drank some of it. He made Ward drink some of the liquor. Ward's money taken by appellant was used for the purchase. Ward testified that appellant hit him in the chest and made him take a drink.
After leaving the Robertson house, appellant required Ward to drive for a distance, after which appellant took over the driving saying that Ward was not "driving right." Appellant then drove several miles in reckless fashion before permitting Ward to again drive the vehicle. Thereafter, appellant ordered Ward to drive to "The Pines," a local beer joint. On the way, Ward was told to turn right onto a dirt road near a white church. Appellant needed to relieve himself, which he did. According to Ward, appellant then returned to the car and forced Ward to commit what Ward described as an "act." At appellant's demand, Ward then drove to The Pines where they got out of the car and entered. Shortly before reaching The Pines, appellant made Ward give him his watch. After arriving at The Pines, appellant took the car keys from Ward. Ward testified that they both got out on the driver's side of the car, with appellant cautioning Ward not to talk while in The Pines. This establishment was located about ten miles from Winona. Appellant testified that a man named Edwards operated The Pines and was at the bar. Appellant bought beer for himself and Ward. The two men then left The Pines and got back in the car, both men again entering from the driver's side. Appellant, who had the keys, placed them in the ignition and ordered Ward to drive. During the trip back to Winona, appellant cursed and threatened Ward for not having any other money.
Ward testified that when they reached the Winona Junior Food Mart, he stopped the car quickly, jumped out leaving the keys behind, and ran into the store. He then attempted to warn the store operator that appellant had instructed him to get some money from the store. Ward testified that he told the woman in the store to lock the door as appellant intended to rob them. Appellant then came in the store, grabbed Ward and tried to pull him outside. As he was being dragged towards the door, Ward grabbed a gum machine and appellant was unable to pull him loose. When one of the store employees announced that she was calling the police, appellant left the store and was last seen leaving the lot in a car with someone else. According to Ward, he and appellant reached the Junior Food Mart between 7:30 and 8:00 o'clock P.M., after having been together, as hereinbefore discussed, since shortly after two o'clock P.M.
The prosecution introduced testimony from witness J.L. Edwards, who stated that he operated "The Hardship Club," commonly known as "The Pines." He knew both appellant and Ward and had seen them in his establishment on the afternoon in question between 4:30 and 5 o'clock P.M. According to Edwards, Ward was seated and appellant was standing close by him. Woods ordered a quart of beer and drank it. Edwards testified that the two men left together.
The prosecution then introduced Thelma Bludsaw, who was working at the Junior Food Mart at the time in question. She knew Ward as he had been in the store many times. She testified that he entered the store between 7:30 and 8:00 o'clock P.M., and was acting very differently from the other times she had seen him. He ran up to her, stating that "you are fixing to be robbed." She testified that he then ran back toward the cooler "like he was trying to run away" and was "looking wild and acting funny." According to Bludsaw, another man came in and told Ward to "come on and let's go."; that he was going out of there or was going to be pulled out. Ward grabbed the gum machine near the door and would not release it. Ward then announced he would not let go of the machine until someone called the police. The other man then turned Ward loose and left. Ward remained in the store holding onto the gum machine until the police arrived. *Page 1322 
Bludsaw did not know the other man involved but identified him at the trial as being the appellant.
The prosecution also introduced John Welch, the night manager of the Junior Food Mart, whose testimony was essentially the same as the previous witness.
Appellant's defense was an alibi. He first placed on the stand a witness named Odis Merritt who owned and operated a business known as "Last Chance." He was asked whether or not appellant was in his place of business on January 6, 1980, and he promptly stated that appellant was in his place of business but he could not say it was on January 6. Merritt testified that whatever day it was, appellant and one C.W. Wright were together. Upon being examined by appellant's attorney as a surprise witness, Merritt stated that appellant was the one who told him the date was the 6th. The witness testified that on the occasion in question appellant came to the cafe about 11 o'clock A.M. and stayed until in the night time.
Appellant Woods testified in his own behalf. He was 26 years of age and stated that he had "heard talk" of Carnell Ward. He testified that on January 6, 1980, he arrived at Merritt's Cafe about 8:30 in the morning and stayed there until 6:30 or 7:00 that evening and that Merritt and one C.W. Wright were present. He testified that he first saw Ward around 6:30 or 7:00 that evening at the Junior Food Mart, and that Ward was acting "crazy." Appellant contended that he had attempted to remove Ward from the store as he was bothering the store employees. Appellant maintained that he had found Ward's watch, introduced into evidence, by the side of the road near his girl friend's house on January 7th.
Did the lower court err in denying appellant's motion for a continuance?
The day prior to trial, appellant's attorney filed a written motion for a continuance, alleging that C.W. Wright, a prospective witness for appellant, was a necessary witness for appellant's defense; that due diligence had been used to procure the presence of Wright but that he was in the University Hospital in Jackson, Mississippi. The only thing in the affidavit for continuance about Wright's testimony was that "he has information regarding the whereabouts of the defendant on the date in question." On the morning of the trial date, appellant's attorney renewed the continuance motion orally. In chambers, it was stated to the trial court that Wright was with defendant on the date in question. There was another oral motion for a continuance. In overruling the motion, the court stated that there was nothing before the court to show whether or not Wright would ever be available to testify as a witness in the cause and overruled the motion for that reason.
We have held repeatedly that an application for a continuance is addressed to the sound discretion of the trial court unless that discretion is abused and the defendant is prejudiced thereby. Fermo v. State, 370 So.2d 930 (Miss. 1979); McClendonv. State, 335 So.2d 887 (Miss. 1976); Sample v. State,320 So.2d 801 (Miss. 1975).
In Burrill v. State, 328 So.2d 334 (Miss. 1976), the statutory procedure to follow in requesting continuances was discussed fully as follows:
 The absence of certain out-of-state witnesses is urged as requiring reversal. Facts expected to be proved by the absent witnesses were not set out nor were the names and addresses of such witnesses set out in an affidavit. Nor was there an affidavit containing a statement that the witnesses were not absent by the consent or procurement of the accused. In King v. State, 251 Miss. 161, 168 So.2d 637
(1964), the proper procedure is outlined as follows:
 "In view of the frequency of these applications we deem it advisable to repeat what has been before substantially said as to the correct course to be pursued by a defendant who applies for a continuance. To begin with he should promptly issue summonses for all witnesses who may be material for his defense; for any witness who has been served with process and who has failed to appear as commanded he should ask for an attachment *Page 1323 
which will never be refused by the court; in capital cases he should apply for a continuance before the venire is drawn, setting out in his affidavit the names and residences of the absent witnesses, the facts expected to be proved by them, and should also show to the court what steps have been taken to secure their attendance; he should negative the idea that they are absent with his consent or procurement, and if any reasons are known to him why they are not present, these should be stated.
 "If the court declines to grant the continuance he should sue out the proper process for them, and when the case is called for trial should renew his application, make such changes in his affidavit as the conditions then existing require. If the continuance is still refused, he should with unremitting diligence seek to secure their attendance pending the trial by the continued use of the process of the court; if tried and convicted he should still persist in his efforts to enforce their attendance before the expiration of the term, and on his motion for a new trial present them to the court for examination; if, with all of his efforts, he is unable to have the witnesses personally present, he should, if practicable, secure their ex parte affidavits, which should be presented for the consideration of the court, which, on the motion for a new trial, will review the whole case and correct any error prejudicial to the defendant which may appear in the proceeding."
The statutory requirements for an application for a continuance are set out in Mississippi Code Annotated section 99-15-29
(1972), which reads as follows:
 On all applications for a continuance the party shall set forth in his affidavit the facts which he expects to prove by his absent witness or documents that the court may judge of the materiality of such facts, the name and residence of the absent witness, that he has used due diligence to procure the absent documents, or presence of the absent witness, as the case may be, stating in what such diligence consists, and that the continuance is not sought for delay only, but that justice may be done. The court may grant or deny a continuance, in its discretion, and may of its own motion cross-examine the party making the affidavit. The attorneys for the other side may also cross-examine and may introduce evidence by affidavit or otherwise for the purpose of showing to the court that a continuance should be denied. No application for a continuance shall be considered in the absence of the party making the affidavit, unless his absence be accounted for to the satisfaction of the court. A denial of the continuance shall not be ground for reversal unless the supreme court shall be satisfied that injustice resulted therefrom.
Considering the foregoing discussion of the evidence, this Court certainly cannot say that it is satisfied that injustice resulted from a refusal to continue the cause. The only information received by the court by affidavit or otherwise was that Wright, the missing witness, knew where appellant had been the day of the alleged incident. The lower court correctly overruled the motion for continuance.
Was the court in error in overruling defendant's request for a directed verdict and/or peremptory instruction?
Appellant contends that the kidnapping count of the indictment was not proved by the state because there was no evidence that the appellant abducted Ward with the intent to secretly confine him. The statute under which this count of the indictment was returned is Mississippi Code Annotated section 97-3-53 (Supp.), which reads as follows:
 Any person who shall without lawful authority forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such person to be secretly confined or imprisoned against his or her will, or shall without lawful authority forcibly seize, inveigle or kidnap any child under the age of ten (10) years and secretly confine such child against the will of the parents or *Page 1324 
guardian or person having the lawful custody of such child, shall, upon conviction, be imprisoned for life in the state penitentiary if the punishment is so fixed by the jury in its verdict. If the jury fails to agree on fixing the penalty at imprisonment for life the court shall fix the penalty at not less than one (1) year nor more than thirty (30) years in the state penitentiary.
 This section shall not be held to repeal, modify or amend any other criminal statute of this state.
Appellant advances the theory that as the state's evidence showed the two men visiting public places, Ward was not being "secretly" confined. We first note that the entire matter consumed at least between five and six hours and the evidence indicates that they were in the two public places for only a short period of time. The testimony from Ward clearly indicates that whatever was done during the hours involved was forced upon him by threats from appellant who had a gun. Except for the stops, including the stop near the church, the entire affair took place in Ward's automobile. In Johnson v. State, 288 So.2d 842
(Miss. 1974), we said the following:
 Johnson now contends that the verdict finding him guilty of kidnapping was neither in accord with the evidence nor the law. He argues that it was not shown that, in abducting Dillon, he did so "with intent to cause such person (Dillon) to be secretly confined or imprisoned against his or her will."
 In 51 C.J.S. Kidnapping § 171(7) (1967) states:
 "A person may be secretly confined in a motor vehicle while it is in motion on the highways of the state or parked in a secluded area."
 When one is forced at gun point to enter an automobile, and while confined therein is driven away against his will from a place where he has a right to be, along a route and to a destination unknown to his friends and acquaintances, he is, within the meaning of the statute, "secretly confined and imprisoned."
 The principles announced in McGuire v. State, 231 Miss. 375, 95 So.2d 537 (1957) support this view and contentions similar to those now advanced by appellant were rejected.
Also see People v. Masterson, 79 Ill. App.2d 117,223 N.E.2d 252 (1967); Jackson v. State, 540 S.W.2d 275 (Tenn.Cr.App. 1976).
It is noted that the statute authorizes conviction in the event the accused should forceably seize and confine any person with the intent to cause such person to be "secretly confined or imprisoned against his or her will." (Emphasis ours). There is no merit to this assignment of error.
Was it error to allow Ward's watch to be introduced in evidence?
Ward testified that during the course of the events in question appellant took his wristwatch. Appellant contends that the allowance of this evidence was erroneous as this act was not listed in the indictment and constituted a separate offense. In the first place, this act was part of the res gestae of the entire time involved in the kidnapping charge. It was an inseparable part of the entire picture and the main transaction.See McCormick v. State, 159 Miss. 610, 132 So. 757 (1931). Furthermore, Ward testified regarding the taking of the watch without objection being made. There is no merit in this assignment of error.
Did the lower court err in allowing Ward to testify that he was forced to commit an "act"?
As hereinbefore set out, Ward testified that at one point during the kidnapping he was forced to commit an "act" on appellant's person. Appellant objects to this testimony as it was not listed in the indictment.
By implication, the act was an "unnatural sexual act" and appellant contends this was highly inflammatory and prejudicial. It should be reiterated that the only testimony that Ward gave was that the occurrence was "an act." When the state attempted to develop that testimony further, *Page 1325 
an objection was sustained thereto by the trial court. There was no request for the court to instruct the jury to disregard any testimony already heard and no motion for a mistrial. SeeClanton v. State, 279 So.2d 599 (Miss. 1973); Cittadino v.State, 199 Miss. 235, 24 So.2d 93 (1945). Furthermore, inBlackwell v. State, 44 So.2d 409 (Miss. 1950), the Court stated:
 It is now well settled that when anything transpires during the trial that would tend to prejudice the rights of defendant, he cannot wait and take his chances with the jury on a favorable verdict and then obtain a reversal of the cause in this Court because of such error, but he must ask the trial court for a mistrial upon the happening of such occurrence when the same is of such nature as would entitle him to a mistrial.
Regardless of the actions of the court or the parties, as stated above, the testimony was not inadmissible. In Gray v.State, 351 So.2d 1342 (Miss. 1977), the Court said:
. . . It is well settled in this state that proof of a crime distinct from that alleged in an indictment is not admissible against an accused. There are certain recognized exceptions to the rule. Proof of another crime is admissible where the offense charged and that offered to be proved are so connected as to constitute one transaction, where it is necessary to identify the defendant, where it is material to prove motive and there is an apparent relation or connection between the act proposed to be proved and that charged, where the accusation involves a series of criminal acts which must be proved to make out the offense, or where it is necessary to prove scienter or guilty knowledge. See Smith v. State, 223 So.2d 657 (Miss. 1969), cert. denied, 397 U.S. 1030, 90 S.Ct. 1274, 25 L.Ed.2d 542 (1970); Cummings v. State, 219 So.2d 673 (Miss. 1969); cert. den. 397 U.S. 942, 90 S.Ct. 954, 25 L.Ed.2d 122 (1970).
There is no merit to this assignment of error.
Should the cause be remanded for resentencing by the trial court.
The jury returned three separate verdicts, one under each count of the indictment. The jury was unable, however, to agree on the penalty to be adjudged under the armed robbery and kidnapping charges. The lower court announced that it was therefore proceeding under Code section 99-19-81 as the indictment charged and the evidence confirmed that appellant had been convicted twice previously of felonies with separate sentences of more than one year. Appellant was sentenced to serve fifteen (15) years with the Department of Corrections under the burglary verdict and a life sentence under each of the armed robbery and kidnapping verdicts. This statute reads as follows:
 Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to separate terms of one (1) year or more in any state and/or federal penal institution, whether in this state or elsewhere, shall be sentenced to the maximum term of imprisonment prescribed for such felony, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation.
It appears that the lower court in imposing the life sentence for each of the convictions for armed robbery and kidnapping was considering that sentence as "the maximum term of imprisonment prescribed for such felony" as set out in the above quoted statute. In this Court's opinion, the maximum term provided for in the statute is the maximum term that may be given by the trial judge and not by the jury when the jury fails to agree thereon. The kidnapping charge was pursuant to Code section 97-3-53, which provides that in the event the jury does not adjudicate the accused to serve a life sentence, the maximum that may be fixed by the trial judge is thirty years.
Under the armed robbery conviction, we have held that in the event the jury finds *Page 1326 
guilt but is unable to arrive at punishment, the lower court is required to consider as a maximum punishment only the number of years that reasonably would be calculated to be less than life for that particular accused. See Stewart v. State,372 So.2d 257 (Miss. 1979).
Therefore, we hold that it is necessary to remand the cause for resentencing pursuant to the above set out principles. The judgment of the lower court on the three convictions does not state whether the sentences are to run concurrently or consecutively. Code section 99-19-21 (1972) reads as follows:
 When a person is sentenced to imprisonment on two or more convictions, the imprisonment on the second, or each subsequent conviction, shall commence at the termination of the imprisonment for the preceding conviction, and the sentence ought to so specify.
Provided, however, that when a person is convicted at the same term of a circuit or county court of more than one offense, the judge of such court may impose sentences on such convictions to run concurrently.
 All orders imposing sentences heretofore to run concurrently, if so ordered, are hereby validated and confirmed. (Emphasis ours).
We realize it is probable that in this particular case the lower court relied on the first part of the above statute and intended the sentences to run consecutively. We believe, however, and earnestly urge trial courts to specify in the sentencing orders whether two or more sentences are to run consecutively or concurrently.
There are other assignments of error propounded by appellant, none of which merit discussion here. It follows that the convictions of appellant should be and they are affirmed and the cause is remanded for resentencing consistent with this opinion.
AFFIRMED AND REMANDED FOR RESENTENCING.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE and HAWKINS, JJ., concur.