223 So.2d 657 (1969)
Bill SMITH
v.
STATE of Mississippi.
No. 45408.
Supreme Court of Mississippi.
June 9, 1969.
Rehearing Denied July 3, 1969.
Carl E. Berry, Jr., Hattiesburg, for appellant.
Joe T. Patterson, Atty. Gen., by G. Garland Lyell, Jr., Asst. Atty. Gen., Jackson, for appellee.
JONES, Justice:
The appellant, William Thomas (Bill) Smith, was convicted in the Circuit Court of Forrest County of the murder of Vernon Dahmer and was sentenced to life imprisonment in the state penitentiary.
Dahmer, a Negro, lived with his wife and three children in a rural community near Hattiesburg. Dahmer's wife testified that she was awakened about two o'clock a.m. on the night of January 10, 1966, by the constant blowing of a car horn and gunshots coming into their home. She saw that the front part of the house was on fire, heard a window break, and then saw *658 the living room explode in flames. Dahmer helped his wife and children out of windows in the back of the house, grabbed his shotgun, and fired at the attackers, not knowing whether they would try to enter the house or not.
Both the home and Dahmer's nearby store were completely destroyed by fire. Dahmer received second degree burns about his arms and face and died that afternoon in the hospital. His death was directly caused by thermal injury from burns of the respiratory tract, peripheral vascular collapse or shock, and hypoxea (decrease in oxygen).
The appellant contends that the trial judge committed five errors during the trial of this case. Three of these assigned errors merit careful consideration and discussion.
They are:
I.
"The Lower Court erred in overruling the appellant's motion to quash the special venire and regular petit jury panel from which jurors were selected to serve in the trial of the appellant in the court below.
II.
"The Lower Court erred in allowing the State to introduce evidence, notwithstanding objections of the Appellant, concerning matters which were not part of the res gestae nor any conspiracy in connection with the crime charged against the Appellant.
III.
"The Lower Court erred in allowing the District Attorney, over the timely objections of the accused, by his Attorney, to make highly prejudicial statements in his closing argument to the jury, unsupported by evidence."
The appellant, in his motion to quash the special venire drawn on July 9, 1968, and the regular petit jury panel drawn for the second week of the July 1968 term, made two general contentions. He alleged that the five compartments of the jury box were not filled with names composing a fair and adequate representation of both sexes, and, secondly, that:
"[B]ecause of the failure of certain members of the Board of Supervisors of Forrest County, Mississippi, to comply with the statutes regulating and directing the procuring, listing and having filed with the Circuit Clerk, the list of jurors placed in the jury box and the separate compartments therein, and certifying said list to the Clerk of the Court, and for other errors committed which represented a drastic departure from the statutory laws pertaining to compiling, drawing, listing and certifying of said prospective jurors, the aforementioned Special Venire and regular Jury panel should be by this Honorable Court quashed and a new Venire drawn from the jury box and five compartments therein which have been selected and placed in said jury box and compartments, and drawn according to law."
The five supervisors of Forrest County were called as witnesses by the appellant, and each testified how he went about marking and selecting the names of prospective jurors on the voter registration books, who typed up the list marked or prepared by him, and the procedure in placing the names of the prospective jurors in each compartment of the jury box. Each supervisor testified that he individually selected names from the poll books but that these names were later put on the minutes of the board of supervisors.
Apparently the appellant's contentions are that the five members of the board of supervisors should not have individually selected names, but should have jointly selected the names of prospective jurors at a regular meeting of the board; that the jury lists should have been recorded on the minutes of the board on the very day that *659 the selections were made and not later during the term; and finally that the lists were not properly certified to the circuit clerk.
In answering these contentions, the State put on Clyde W. Easterling, chancery clerk; Mrs. Eloyse Dennis, deputy chancery clerk and secretary of the board of supervisors; and Theron C. Lynd, circuit clerk.
Mr. Easterling testified that for the 16 1/2 years that he had been chancery clerk that his office had always certified the original copy of the jury list to the circuit clerk and retained a copy to go on the board's minutes. He further testified that Mrs. Dennis, a deputy chancery clerk for seven years and now, in addition, secretary of the board of supervisors, prepared these lists from notes or lists handed to her by the five members of the board of supervisors. He further testified that it was physically impossible sometimes to record the lists on the minutes of the board on the very day that the selections were made, but that the minutes of the board were opened on the first Monday of each month and that the board did not adjourn until the last of each month, that the lists were always on the minutes before adjournment of the board, and that the president of the board of supervisors always signed the minutes as required by law before adjournment of the monthly meeting.
Mrs. Dennis testified that she handled all of the minutes of the board, that after the jury lists were typed up and certified to the circuit clerk, the usual procedure was to put them on the minutes of the board "closest to the date that they are certified over there." She testified that she prepared three copies of each jury list and distributed the copies in this way:
"One of them is certified to the Circuit Clerk, one of them is left in Mr. Easterling's office to be put in the Minutes of the Board of Supervisors, and the original copy is given to Mr. Lynd to cut up and put in the jury box."
She further testified that the list of the special venire and the list for the second week of the July 1968 term had already been certified to the circuit clerk and had already been recorded in Minute Book 68, which was a new minute book, when counsel for appellant made his check, and that he had only checked Minute Books 66 and 67.
Mr. Lynd, the circuit clerk, testified that he had been circuit clerk since January 1959 and that no names had ever been put in the five separate compartments of the jury box until those names had first been submitted to his office over the certificate of the chancery clerk of Forrest County. There were names of women on the lists of the special venire and regular venire for the second week of the July 1968 term.
The board of supervisors can act only through its official minutes, and when these minutes are signed by the president of the board at the end of the monthly meeting, they become the action of the whole board and not of the individual members. The testimony was positive that the list of the special venire and the list of the regular venire were properly certified to the circuit clerk, were properly recorded on the official minutes of the board in due course, and that the president of the board signed these minutes. The appellant did not prove otherwise, and the court was correct in overruling the motion to quash.
The appellant next complains that the lower court erroneously allowed the State to introduce evidence "concerning matters which were not part of the res gestae nor any conspiracy in connection with the crime charged against the Appellant." He contends that the most damaging evidence in this respect was brought out on his cross-examination by the district attorney.
On the threshold of this case counsel for the appellant recognized that the Ku Klux Klan was inextricably connected with this *660 crime because he questioned each prospective juror on the voir dire examination, over objection of the district attorney, if the fact that appellant was a member of the Klan or connected with it would have any influence on him in his decision.
When the appellant took the stand in his own defense, his own counsel brought out on direct examination that he was initiated into the White Knights of the Ku Klux Klan in November 1964. His own counsel asked him if he knew Deavours Nix, Sam Bowers, Lester Thornton, Henry DeBoxtel, Cecil Sessum, and Cliff Wilson, all of whom were active Klan members, and when appellant answered that he did know each and every one of them, his own counsel went further and asked him:
Q. Have you had any conversations with any of those Klan members with reference to the commission of this heinous crime of murder and arson prior to the commission thereof or at any other time before?
A. No, Sir.
After the appellant himself, in answering questions of his own counsel, had testified about his initiation and his acquaintanceship with these Klan members, the district attorney did cross-examine him about his initiation, subsequent meetings that he attended, and his duties and responsibilities at these meetings. The appellant testified about the oath that each Klansman must take to aid and lend assistance at any time of the day or night when another Klansman is in distress or needs help of any type, kind, or character. The appellant, on cross-examination, testified that a Klansman violating his oath would suffer banishment and the penalty would be to "kick him out of the Klan." Cross-examination brought out that the appellant refused to talk with the F.B.I. in any way.
In addition to the latitude that should be allowed in cross-examination, there is some leeway afforded in proving conspiracy. Wharton's Criminal Evidence (11th ed. 1935), Section 355, page 537, says:
"It is well settled that evidence of a general scheme of conspiracy and confederation to commit crime is admissible, on the part of the state, for the purpose of proving scienter, motive, intent, and the like, where a single offense only is charged in the indictment. And if it is competent to prove a conspiracy, it follows that any evidence tending to establish the conspiracy is also competent. Hence, evidence of collateral offenses which are inseparably interwoven with the offense charged, and which also tend to show conspiracy, is admissible." (Emphasis added).
One of the purposes of cross-examining the appellant about his connection with the Klan was to prove scienter, motive, and intent. Another purpose was to question the credibility of the appellant where the very oath that he took, the training that he received, and the discipline that was imposed was to impress upon him and the other members that they must protect fellow members at all costs and under all circumstances and that they must obey implicitly the orders of the officers of the Klan. This testimony was vital and of definite probative value in determining whether the appellant was present at any of the planning meetings and whether the appellant's testimony was credible.
The crimes of arson and murder against Vernon Dahmer were not the brainchild of private citizen Bill Smith. These crimes were projects 3 and 4 of the White Knights of the Ku Klux Klan. Appellant was questioned about these project numbers. He knew exactly what they meant, and he knew by virtue of being a Klansman. These crimes were conceived, nurtured, and brought to full fruition by the Klan. Duties were assigned to different Klansmen by officers of the Klan, and *661 each Klansman was expected to perform his assignment without question.
The testimony that convicted appellant was the testimony of a fellow Klansman, an eyewitness who rode in the same automobile with the appellant, an automobile owned by Cliff Wilson, appellant's employer and his sponsor in the Klan, and two other Klansmen to the scene of the crime that night of January 10, 1966. This eyewitness pointed out the appellant as being the man who followed through on his assignment and shot out the picture window in the home of Dahmer so that another member of the Klan could throw into the home through the broken window plastic jars of gasoline and a torch of burning rags tied to a stick.
This partner in crime testified that the two carloads (eight Klansmen) assembled in a churchyard shortly before the execution of projects 3 and 4, that an officer of the Klan assigned appellant the specific duty of shooting out the picture window of the home and to keep shooting with a sawed-off pump shotgun.
When the lights of one of the two getaway cars were inadvertently turned on at the scene of the crime, the appellant was positively identified as the one who impulsively shot out the lights and punctured two of the tires of the getaway car. A car with two flat tires and other indentations in the front fenders apparently made by buckshot was found abandoned about two miles from the scene.
Some of the judges feel that portions of the testimony elicited on cross-examination, which traced the Klan activities of the appellant from his initiation in November 1964 to the latter part of 1965, was error, but that under all the circumstances, constituted harmless error.
The writer of this opinion and other judges feel that it was not error and that it did have a definite place in proving scienter, motive, and intent, that it also constituted legitimate cross-examination in testing the credibility of the appellant.
The appellant complained of certain statements of the district attorney in his closing argument to the jury. We have carefully studied the statements made and included in the record in a Special Bill of Exceptions. This was a long and hard-fought case on the part of the prosecution and the defense. We do not feel that these remarks of the district attorney, when considered in context and as an infinitesimal part of a four-volume record, were prejudicial or out of line. Neither do we feel that these remarks were wholly unsupported by the evidence as contended by the appellant.
The judgment is affirmed.
Affirmed.
GILLESPIE, P.J., and RODGERS, JONES, BRADY, and INZER, JJ., concur.