# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-00750-COA

**TRACY ELLIS**                                            **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/25/2019 |
| TRIAL JUDGE: | HON. DEWEY KEY ARTHUR |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MERRIDA COXWELL |
| | CHARLES RICHARD MULLINS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ABBIE EASON KOONCE |
| DISTRICT ATTORNEY: | JOHN K. BRAMLETT JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/15/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WILSON, P.J., FOR THE COURT:**

¶1. Following a jury trial in the Madison County Circuit Court, Tracy Ellis (Ellis) was convicted of two counts of fondling for molesting his stepdaughters, AX and AY.[1] The circuit court sentenced Ellis to two consecutive terms of fifteen years in the custody of the Mississippi Department of Corrections (MDOC). On appeal, Ellis argues that the trial judge abused his discretion by (1) admitting evidence, pursuant to Mississippi Rule of Evidence 404(b), that Ellis had molested AX and AY for several years prior to the acts charged in the

---

[1] Initials are used to protect the identity of the victims.

indictment; (2) denying Ellis's motion for a new trial; (3) excluding family photos and a letter that AX sent to her mother and Ellis; and (4) admitting evidence of Google Hangouts messages and text messages that Ellis sent to AY. We find no reversible error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Alicia Ellis (Alicia) and Ellis began dating in 2009 in North Carolina. In 2010, Alicia and her three daughters, AX, AY, and AB, moved to Oklahoma with Ellis. In Oklahoma, Ellis began paying AX, then eleven years old, and AY, then ten years old, to give him back and shoulder massages. Initially, AX and AY massaged Ellis in the family's living room, but Ellis later asked them to massage him in his bedroom instead. Ellis would lock the bedroom door while the girls massaged his back, shoulders, legs, and buttocks. Alicia knew that AX and AY were giving Ellis massages, and she thought it "was kind of weird," but she "never said anything because . . . [she] tried her best to . . . trust . . . [Ellis]." Alicia did ask Ellis why he locked their bedroom door. Ellis responded that Alicia's walking "in and out of the bedroom . . . was interrupting his sleep and relaxation of getting a massage."

¶3.     AX and AY testified that in 2010 Ellis pulled them into a "dim" room and showed them how to "rub" his penis. They took turns rubbing Ellis's penis until he ejaculated. After this incident, Ellis began asking the girls for "rubs" in addition to back massages. AX and AY understood that when Ellis asked for a "massage," he wanted a traditional massage, but when Ellis asked for a "rub," he wanted them to rub his penis. AX and AY did not talk about these incidents with one another. AX and AY both testified that Ellis would pay them twenty dollars or more "to rub his penis."

2

¶4. In 2013, the family moved back to North Carolina, and Alicia and Ellis married. In 2015, the family moved to Mississippi. By this time, Alicia and Ellis were having marital problems and were discussing a divorce. AX and AY testified that the massages and "rubs" continued in North Carolina and Mississippi.

¶5. In January 2018, Ellis and Alicia had an argument related to their discussions about a divorce. After the argument, Alicia went into AY's room and saw that AY "was in deep thought." Alicia asked AY what was on her mind, and AY disclosed that she and AX had been "massaging [Ellis's] penis" for some time. At the time, AX was away from home for military training. Alicia texted AX about AY's disclosure, and AX confirmed that it was true. Alicia and AY then went to the Ridgeland Police Department to report Ellis's abuse. Ellis was arrested, and he was indicted for two counts of fondling, one count for molesting AX, and one count for molesting AY. The case proceeded to trial in January 2019.

¶6. Alicia testified that she had seen AX and AY giving Ellis back massages. She also testified that Ellis locked the bedroom door whenever AX or AY massaged him in the marital bedroom. She testified that her daughters told her "maybe two times" that they were fearful of Ellis. Alicia stated that neither girl disclosed any abuse prior to January 2018. However, around March 2017, AY told Alicia about an incident that made AY uncomfortable. AY told Alicia that Ellis had hugged her inappropriately in the hallway and "touched her butt." AY also told Alicia that Ellis had sent her text messages about the incident. When Alicia confronted Ellis about the incident and the messages, Ellis "never denied it. He just basically said that he was just being country and that's how he played."

3

¶7. AY testified that Ellis first told her to rub his penis when she was ten years old and they lived in Oklahoma. She testified that this abuse continued in North Carolina and Mississippi. AY testified that as she got older, she felt "disgust[ed]" whenever she rubbed Ellis's penis, but she was "scared to say no to [Ellis] because he [was] . . . intimidating, especially when [he was] angry." However, while the family was living in Mississippi, AY refused to continue rubbing Ellis's penis. At that point, Ellis told her, "If I'm cut off, then you're cut off." According to AY, Ellis then began treating her differently than AX and cut her off both financially and emotionally.

¶8. AX testified that she rubbed Ellis's penis from the time she was eleven years old until she left home at the age of eighteen to join the military. AX stated that she joined the military "to get out of the house" and away from "a scared environment." AX testified that she continued to rub Ellis's penis after AY stopped because she was "afraid to stop" and "wanted to have a relationship with [Ellis]." AX stated that after AY stopped giving Ellis "rubs," Ellis treated AY differently. Ellis constantly "talked down" to AY and called her "stupid." AX testified, "[O]f course I didn't want that . . . to happen to me." AX did not tell anyone about Ellis's abuse until she told Alicia in January 2018.

¶9. Leslie Owens, an investigator with the Ridgeland Police Department, testified that she met with Alicia, AX, and AY to discuss their allegations against Ellis. AY showed Owens messages on her cell phone that Ellis allegedly sent to her. These included both standard text messages and messages on the Google Hangouts application. However, Owens did not examine the phone to attempt to verify the number or identity of the sender. After

4

interviewing Alicia, AX, and AY and obtaining affidavits from the girls, Owens concluded that there was sufficient evidence to arrest Ellis.

¶10. Ellis testified at trial. He denied that his stepdaughters had ever touched or rubbed his penis. In addition, Ellis denied sending the text messages and Google Hangouts messages that were introduced into evidence at trial. Ellis admitted that Alicia confronted him about hugging AY in the hallway in a way that made AY feel uncomfortable. However, Ellis testified that Alicia's only complaint was that he had "picked [AY] up and held her" when he hugged her, nothing more. Ellis also admitted that his stepdaughters gave him back massages, that some of the massages took place in his locked bedroom, and that he began paying his stepdaughters for the massages as they got older. Ellis stated, "I didn't get them to do anything. They volunteered to do it. I never made them do anything."

¶11. The jury found Ellis guilty on both counts of the indictment. The court sentenced Ellis to two consecutive terms of fifteen years in MDOC custody. Ellis filed a motion for judgment notwithstanding the verdict or a new trial, which the court denied, and a notice of appeal. On appeal, Ellis argues that the trial judge abused his discretion by (1) admitting evidence under Mississippi Rule of Evidence 404(b) that Ellis had molested AX and AY for several years prior to the acts charged in the indictment; (2) denying Ellis's motion for a new trial; (3) excluding family photos and a letter that AX sent to Alicia and Ellis; and (4) admitting evidence of text messages and Google Hangouts messages that Ellis sent to AY.

**ANALYSIS**

**I.      Rule 404(b) Evidence**

¶12.    Prior to trial, the State filed a notice of intent to introduce evidence that Ellis "molested the victims and acted inappropriately on other occasions." The State argued that the evidence was relevant and admissible under Mississippi Rule of Evidence 404(b) to show the "pedophilic, sexual motive" of Ellis toward AX and AY. At a pretrial hearing, the State explained that AX and AY would testify to "how the abuse started and that it started out with giving massages and then moved into massaging [Ellis's] penis, how it then moved into doing that for payment, [and] how there were occasions where they watched pornographic materials with [Ellis]." The trial judge ruled that the evidence was admissible under Rule 404(b) and was "more probative than unfairly prejudicial." In addition, before AX and AY testified, the judge gave a limiting instruction "regarding other alleged acts of [Ellis that were] offered in an effort to prove motive and opportunity, intent and absence of mistake or accident." The judge instructed the jury, "You may give [such] testimony such weight and credibility as you deem proper under the circumstances; however, you cannot and must not consider the testimony in any way regarding whether [Ellis] is guilty or not guilty of the crime for which he is presently on trial." The judge gave the same oral and written instruction after the close of the evidence. Ellis requested that the instruction be given and did not suggest any changes to its substance.

¶13.    "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." M.R.E. 404(b)(1). However, such "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity,

6

absence of mistake, or lack of accident." M.R.E. 404(b)(2). Moreover, our Supreme Court "has repeatedly held that 'evidence of prior sexual acts between the accused and the victim is admissible [under Rule 404(b)] to show the accused's lustful, lascivious disposition toward the particular victim, especially in circumstances where the victim is under the age of consent.'" *Caldwell v. State*, 6 So. 3d 1076, 1078 (¶6) (Miss. 2009) (quoting *Walker v. State*, 878 So. 2d 913, 915 (¶14) (Miss. 2004)).

¶14.    If the evidence is offered for a permissible purpose under Rule 404(b), it still "must pass through the ultimate filter of [Rule] 403." *White v. State*, 842 So. 2d 565, 574 (¶27) (Miss. 2003) (quotation marks omitted). Under Rule 403,"[t]he court *may* exclude relevant evidence if its probative value is *substantially outweighed* by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." M.R.E. 403 (emphasis added).

¶15.    At trial, both AX and AY testified that Ellis began abusing them in Oklahoma when they were eleven and ten years old, respectively. They also testified similarly regarding the progression leading up to the abuse—from traditional massages, to massages in a locked bedroom, to sexual abuse. They also both testified that the abuse continued as the family moved to North Carolina and eventually to Mississippi. Under Supreme Court precedent, their testimony regarding Ellis's history of sexual abuse against them was admissible under Rule 404(b) to prove Ellis's "lustful, lascivious disposition toward [them]." *Caldwell*, 6 So. 3d at 1078 (¶6). Moreover, the trial judge did not abuse his discretion by ruling that the evidence was "more probative than unfairly prejudicial."

7

¶16. Citing *White v. State*, 228 So. 3d 893 (Miss. Ct. App. 2017), Ellis argues that the trial judge committed reversible error by not identifying on the record the specific purpose for which the evidence was admissible under Rule 404(b). However, the lead opinion in *White*[2] concluded "the circuit court abused its discretion in admitting . . . highly prejudicial and minimally probative nine-year-old, uncharged statutory-rape evidence." *White*, 228 So. 3d at 902 (¶22). The trial judge committed no similar abuse of discretion in this case.

¶17. Moreover, our Supreme Court has held that "the trial court's failure to identify the specific applicable exception(s) under Rule 404(b) does not require reversal." *Green v. State*, 89 So. 3d 543, 551 (¶17) (Miss. 2012); *accord, e.g.*, *Johnson v. State*, 204 So. 3d 763, 768 (¶15) (Miss. 2016); *Masters v. State*, 285 So. 3d 192, 197 (¶17) (Miss. Ct. App. 2019). Here, the evidence was admissible for the purpose identified in the State's notice of intent, and we find no abuse of discretion in the trial judge's ruling admitting the evidence.

## II. Weight of the Evidence

¶18. Ellis next contends that he is entitled to a new trial because the jury's verdict was against the overwhelming weight of the evidence. The trial judge, having heard the evidence and observed the witnesses firsthand, is in a far better position than this Court to rule on a motion for a new trial. *Little v. State*, 233 So. 3d 288, 291-92 (¶¶17-19) (Miss. 2017). Therefore, we review the trial judge's decision denying a new trial only for an abuse of discretion. *Id.* at 292 (¶21). In addition, we must "view the evidence in the light most

---

[2] *White* produced no identifiable majority opinion. The lead opinion—which found that reversal was required for "many reasons"—was joined in full by only one other judge and joined in unspecified part and in result by three other judges, which resulted in a reversal of the conviction by a 5-4 vote. *White*, 228 So. 3d at 912 (¶60).

favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* at 289 (¶1). We do not "assume[] the role of juror on appeal. We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id.*

¶19. Ellis claims that both AX and AY falsely accused him in order to help Alicia obtain a divorce. Ellis also argues that AX's and AY's testimonies were inconsistent and confusing and that there is no corroborating physical evidence. However, "[o]ur case law holds that the unsupported word of the victim of a sex crime is sufficient to support a guilty verdict where the testimony is not discredited or contradicted by other credible evidence, especially if the conduct of the victim is consistent with the conduct of one who has been victimized by a sex crime." *Cross v. State*, 759 So. 2d 354, 356 (¶11) (Miss. 1999).

¶20. In this case, AX's and AY's testimonies regarding Ellis's abuse were consistent on material points. Moreover, Alicia confirmed and Ellis admitted that Ellis paid both girls for massages behind locked doors. In addition, AY testified that Ellis "grabb[ed] her butt . . . in a sexual way." When Alicia confronted Ellis about the incident, he did not deny it but simply stated that "he was just being country and that's how he played."

¶21. The "task of evaluating the credibility of each witness is properly left to the sole province of the jury." *Blackwell v. State*, 744 So. 2d 359, 364 (¶18) (Miss. Ct. App. 1999). "Our role as an appellate court is to review the trial court's decision to grant or deny a new trial for an abuse of discretion." *Little*, 233 So. 3d at 292 (¶21). The jury heard the

9

testimonies of AX, AY, Alicia, and Ellis. The jury obviously found that AX and AY were credible witnesses and that Ellis was not. Moreover, Ellis presented nothing, other than his own denials, to contradict the evidence against him. Viewing the evidence in the light most favorable to the verdict, we cannot say that the verdict was against the overwhelming weight of the evidence or that the trial judge abused his discretion by denying Ellis's motion for a new trial.

### III. Exclusion of Evidence

¶22. Ellis next argues that the trial judge abused his discretion by excluding Exhibit D-2, a composite of family photos, and Exhibit D-3, a letter that AX wrote to Alicia and Ellis during her military training. We review a trial judge's rulings admitting or excluding evidence only for an abuse of discretion. *Floyd v. City of Crystal Springs*, 749 So. 2d 110, 113 (¶12) (Miss. 1999). Furthermore, "[w]here error involves the admission or exclusion of evidence, this Court will not reverse unless the error adversely affects a substantial right of a party." *Id.* (quotation marks omitted).

### A. Exhibit D-2

¶23. During Alicia's testimony, Ellis attempted to offer Exhibit D-2, a composite of eleven photos showing the family with Ellis. The photos showed AX and AY smiling with Ellis, and Ellis argued that they were relevant to show his "relationship with these children" and to rebut AX and AY's claims that they had been afraid of him. The State objected to the photos as irrelevant and because they were not produced in discovery.[3] The trial judge stated

_____

[3] *See* MRCrP 17.3(2) (requiring the defendant to produce any photos that he intends to offer at trial if he makes a request for discovery under Rule 17.2). Ellis made a pretrial

10

that the photos might "become relevant at some point" when AX or AY testified. However, the judge ruled, "[A]t this point in time, I'm going to sustain the objection on the grounds of discovery but most importantly relevance at this time." Ellis did not attempt to introduce the photos during the testimony of AX or AY.

¶24.    If the photos were relevant to some aspect of AX's or AY's testimonies, then Ellis should have offered them at that point. Indeed, the trial judge specifically stated that the photos might "become relevant at some point" during their testimony. However, Ellis failed to do so. Moreover, AX and AY only testified that they were afraid of Ellis at times or in certain situations. Photos of the girls smiling in family photos in other situations do not contradict that testimony. Therefore, we cannot say that the trial judge abused his discretion by excluding the photos as irrelevant.

### B.    Exhibit D-3

¶25.    Ellis also argues that the trial judge abused his discretion by excluding Exhibit D-3, a two-page letter that AX wrote to Alicia and Ellis during her military training. In her direct examination, AX testified that she was fearful of Ellis and that she joined the military partly to get out of the house and get "away from the scared environment." Ellis argued that D-3 was relevant to show that AX was not fearful of him because AX indicated in the letter that she missed her family.[4] The State objected on the grounds that the letter was not relevant and

---

request for discovery under Rule 17.2 but admitted that he failed to produce the photos in response to the State's request for reciprocal discovery.

[4] In the letter, AX primarily talked about her experiences during military training. In closing, AX stated, "Tell everyone I said hey and I'm doing good. Love all of you."

was not disclosed in discovery. The trial judge excluded the letter, finding that "the fact she wrote her mother and [Ellis] a letter [was not] particularly relevant." However, the trial judge admitted Exhibit D-4, which was a similar letter that AX wrote to Ellis during her military training. The court determined that D-4 was relevant to AX's testimony regarding her alleged fearfulness of Ellis.

¶26. We cannot say that the trial judge abused his broad discretion by finding that D-4 was relevant but D-3 was not. *See Farris v. State*, 906 So. 2d 113, 117 (¶7) (Miss. Ct. App. 2004) ("The trial court has broad discretion in determining the relevance of evidence . . . ."); *see also Irby v. State*, 49 So. 3d 94, 100 (¶16) (Miss. 2010) ("A trial judge enjoys a considerable amount of discretion as to the relevancy and admissibility of evidence." (quoting *Graves v. State*, 492 So. 2d 562, 565 (Miss. 1986))). D-3 added nothing to D-4, and the trial judge did not abuse his discretion by finding that the fact that AX had written a letter to both her mother and her stepfather was not relevant to any material fact in the case. *See* M.R.E. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the case."). Accordingly, this issue is also without merit.

### IV. Google Hangouts Messages and Text Messages

¶27. Next, Ellis contends that the trial judge abused his discretion by admitting Exhibits S-5 and S-6. Exhibit S-5 is a screenshot of messages that Ellis allegedly sent to AY on the Google Hangouts application. Exhibit S-6 is a photo of text messages that Ellis allegedly sent to AY. Ellis argues that the messages were not properly authenticated.

¶28.    We review a trial judge's ruling on authenticity only for an abuse of discretion. *Ragin v. State*, 724 So. 2d 901, 903 (¶7) (Miss. 1998). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence *sufficient to support a finding* that the item is what the proponent claims it is." M.R.E. 901(a) (emphasis added). Under Rule 901, "[a] party need only make a prima facie showing of authenticity, not a full argument on admissibility. Once a prima facie case is made, the evidence goes to the jury *and it is the jury who will ultimately determine the authenticity of the evidence, not the court*." *Garcia v. State*, No. 2017-DP-00504-SCT, 2020 WL 2487383, at *20 (¶94) (Miss. May 14, 2020) (emphasis added) (quoting *Walters v. State*, 206 So. 3d 524, 535 (¶32) (Miss. 2016)). "In other words, the [proponent of the evidence is] not required to rule out all possibilities inconsistent with authenticity." *Id.* (quotation marks omitted). "The only requirement is that there has been substantial evidence from which [the jury] could infer that the [evidence] was authentic." *Young v. Guild*, 7 So. 3d 251, 262 (¶36) (Miss. 2009) (quoting *Sewell v. State*, 721 So. 2d 129, 140 (¶60) (Miss. 1998)).

### A.    Exhibit S-5

¶29.    As stated above, Exhibit S-5 is a screenshot of messages that Ellis allegedly sent AY on her phone via the Google Hangouts application. The screenshot shows that AY was interacting with "Tracy Ellis," whose profile picture was a photo of Ellis. AY testified that she regularly messaged with Ellis using the application. The exchange between Ellis and AY on February 8 and 13, 2017, was as follows:

13

Ellis: I don't suppose you would wanna give me a quick rub,[5] would you?

AY: No

Ellis: Ok, just wanted to try, LOL.

Ellis: Damn!!!! You are such a hotty. May I hug & cuddle with you more often?

AY: Well u can hug me more often.

Ellis: Can I hug you more like I did in the hallway?

AY: Um . . . No

Ellis: Really??? Thats fine, if I'm cut off; you're cut off as well.

¶30. The first three messages were sent on February 8, 2017. The remaining messages were sent on February 13, 2017. AY testified that the February 13 exchange occurred immediately after the incident in which Ellis "grabb[ed] her butt" in the hallway of their home. AY further testified that Ellis was the only other person who knew about the incident at the time the messages were sent. As discussed above, Alicia testified that AY later told her about the incident and the messages, and Alicia confronted Ellis about the incident and specifically about the messages. Alicia testified that Ellis did not deny that the incident occurred, nor did he deny the statements he made in the messages.

¶31. Evidence can be authenticated in many different ways. M.R.E. 901(b). Rule 901 lists nine specific "examples" of proper methods of authentication, but it also makes clear that those are "examples only" and "not a complete list." *Id.* Our Supreme Court has stated that

---

[5] As discussed above, AY testified that when Ellis asked for a "rub," he wanted her to massage his penis.

"[t]he ease with which defendants and alleged victims alike could fabricate a social media account to corroborate a story necessitates more than a simple name and photograph to sufficiently link the communication to the purported author under Rule 901." *Smith v. State*, 136 So. 3d 424, 433 (¶21) (Miss. 2014). However, even in this context, the Court recognized that there remain a number of viable options for authenticating such evidence. *Id.* This includes, as relevant here, evidence that "the purport[ed] sender admit[ted] authorship" or that "the communication contains information that only the purported sender could be expected to know." *Id.*

¶32. In the present case, the trial judge noted that Alicia "testified without objection that she confronted [Ellis] about these messages and about the hug in the hallway, and [Ellis] said specifically, 'I was just being country,' something to that effect." In other words, according to Alicia, Ellis effectively admitted that he sent the messages. Given Alicia's testimony, the trial judge concluded that Ellis's objection went "to the weight [of the evidence], not [its] admissibility." In addition, AY testified that she received the messages about the "hug . . . in the hallway" immediately after Ellis hugged and groped her inappropriately in the hallway. AY testified that at that time, only she and Ellis knew about the incident.

¶33. On these facts, we cannot say that the trial judge abused his discretion by admitting Exhibit D-5. As discussed above, the State's burden was only to "produce evidence sufficient to support a finding" that the evidence was authentic. M.R.E. 901(a). Once that burden is met, "it is the jury who will ultimately determine the authenticity of the evidence, not the court." *Garcia*, 2020 WL 2487383, at *20 (¶94) (quoting *Walters*, 206 So. 3d at 535

(¶32)). "The only requirement is that there has been substantial evidence from which [the jury] could infer that the [evidence] was authentic." *Young*, 7 So. 3d at 262 (¶36) (quoting *Sewell*, 721 So. 2d at 140 (¶60)). Here, the testimony of Alicia and AY—if believed—was sufficient to support a finding that Ellis sent the messages shown in Exhibit D-5. Ellis complains that there is no "independent corroboration" that he sent the messages, but the trial judge did not abuse his discretion by ruling that there was enough evidence to support a finding of authenticity and that Ellis's objections went to the weight of the evidence rather than its admissibility.

### B.    Exhibit S-6

¶34.    As stated above, Exhibit S-6 is a photo of two traditional text messages that Ellis allegedly sent to AY. The photo shows that the messages were sent by "Pop," but it does not show the sender's phone number. AY testified that she saved Ellis's phone number in her phone as "Pop." In the messages, "Pop" first stated that he was "coming up with jobs for [AY] & how much [AY should] be paid" for the jobs. "Pop" then asked whether AY was "willing to massage [him] based on [his] needs." "Pop" stated that massages were "just another option that [would] lead to [AY] earning more money." "Pop" stated that it was "ok" if AY was "not willing to do" massages. AY testified that she only had a photo of the text messages because the messages were saved on an old phone that did not have a screenshot feature. Therefore, she used her mother's phone to take a photo of the messages and then provided the photo to the police. The police did not take possession of AY's phone or take any other steps to determine whether the messages were sent from a phone number associated

16

with Ellis. As stated above, Ellis objected to S-6 on the ground that it was not properly authenticated. The trial judge initially reserved ruling on S-6 but ultimately admitted it into evidence over Ellis's objection.

¶35. Unlike Exhibit S-5, there is no substantial evidence in the record to show that Ellis sent the text messages depicted in S-6. Rather, the record contains only AY's unverifiable claim that "Pop" was a contact with a phone number that belonged to Ellis. In *Smith*, *supra*, the Supreme Court stated that "something more than simply a name and [a] small, blurry photograph . . . is needed to identify the [owner of a] Facebook account." *Smith*, 136 So. 3d at 433 (¶20). In addition, more than that was necessary "to make a prima facie case that the messages were actually sent by [the account's owner]." *Id.* at 434 (¶25). In this case, we do not have even a name or a profile picture—or even a phone number or any other identifying information. We have only a nickname assigned *by the recipient*. A person can assign any nickname to a phone number stored in his or her own phone, so the fact that the messages at issue came from "Pop" proves nothing in and of itself. Moreover, other than the fact that the messages are consistent with the allegations against Ellis, there is nothing unique about the messages that identifies him as the sender. Nor is there any evidence that Ellis was ever confronted about or admitted sending these messages. Under these circumstances, Exhibit S-6 was not properly authenticated as having been sent by Ellis, and it should not have been admitted into evidence.

¶36. However, "[t]o warrant reversal, two elements must be shown: error and injury to the party appealing." *Gray v. State*, 799 So. 2d 53, 61 (¶30) (Miss. 2001). In other words, "[w]e

will not reverse a conviction based on a harmless error." *Chaupette v. State*, 136 So. 3d 1041, 1047 (¶12) (Miss. 2014). We conclude that the error in this case was harmless. Exhibit S-6 did not contain any admission of guilt or any express reference to any conduct of a sexual nature. "Pop" simply inquired whether AY would be willing to give massages for money. As discussed above, Ellis readily admitted that he paid both AX and AY for massages behind a locked bedroom door. Accordingly, Exhibit S-6 was nothing more than corroboration of what Ellis himself admitted, and we fail to see how he was prejudiced by its admission. Therefore, the error was harmless.

## CONCLUSION

¶37. The trial judge did not abuse his discretion by admitting evidence under Rule 404(b), by denying Ellis's motion for a new trial, by excluding Exhibits D-2 and D-3, or by admitting Exhibit S-5. We conclude that Exhibit S-6 was not properly authenticated and should not have been admitted; however, the error was harmless in light of Ellis's own testimony and the weight of the evidence against him. In short, Ellis received a fair trial, and the jury's verdict finding him guilty was not against the overwhelming weight of the evidence.

¶38. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD AND LAWRENCE, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**